FILED

MAR 29 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

In re:                          )   BAP No.   SC-15-1222-FJuKi
                                )
JAMES BERTRAM MORRIS, JR.,      )   Bk. No.   14-02962-CL7
                                )
                Debtor.         )
_____ )
                                )
JAMES BERTRAM MORRIS, JR.;      )
MARK NISHI,                     )
                                )
                Appellants,     )
                                )
v.                              )   **MEMORANDUM**[*]
                                )
GERALD DAVIS, Chapter 7         )
Trustee; JEANEEN McGEE,         )
                                )
                Appellees.      )
_____ )


Argued and Submitted on March 17, 2016
at Pasadena, California

Filed – March 29, 2016

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Christopher B. Latham, Bankruptcy Judge, Presiding

---

Appearances:    Michael A. Gardiner argued for Appellant James
                Bertram Morris, Jr.; Kathryn A. Millerick argued
                for Appellee Gerald Davis, Chapter 7 Trustee.

---

Before: FARIS, JURY, and KIRSCHER, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see Fed. R. App. P. 32.1, it has no precedential value, see 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Appellants James Bertram Morris, Jr. and his friend and business partner Mark Nishi appeal from the bankruptcy court's order granting Appellee and chapter 7[1] trustee Gerald H. Davis' motion to settle claims of Appellee Jeaneen McGee against Mr. Morris' estate. We hold that the bankruptcy court did not abuse its discretion when it approved the settlement. Accordingly, we AFFIRM.

**FACTUAL BACKGROUND**

**A.    The Arizona family court proceedings**

Mr. Morris and Ms. McGee were involved in contentious divorce proceedings before the Arizona family court. On March 10, 2009, the family court approved a Consent Decree of Dissolution of a Non-Covenant Marriage, which incorporated by reference the attached Property Settlement Agreement. The Property Settlement Agreement provided for the division of substantial assets, including certain pending lawsuits. Paragraph 29 of the Property Settlement Agreement discussed the disposition of the so-called Cadence lawsuit:

> 29.    CADENCE LAWSUIT.
>
> The community formerly sued a company that will here be called "Cadence" on theories which need not here be discussed. The community lost that lawsuit in a Federal District Court, and that Court's decision has been appealed to the Ninth Circuit Court of Appeals where it is currently being considered. . . .

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1-86.

It appears that the attorneys who originally represented the community in the Federal District Court lawsuit against Cadence, which resulted in the dismissal and subsequent appeal to the Ninth Circuit, may have been negligent in their handling of the original case, and consequently caused the community to lose a viable and valid claim against Cadence, and thus to suffer damages. . . .

Exhibit A to the agreement provided that Mr. Morris and Ms. McGee would each take "50% of all right and value in the 'Cadence' lawsuits **and related lawsuits** (See paragraph 29)." (Emphasis added.)

A few months later, Mr. Morris initiated a malpractice action against his original attorneys in the Cadence lawsuit. About three years later, he settled the malpractice suit for $1,125,000. Both before and after the settlement of the malpractice litigation, Mr. Morris told Ms. McGee via e-mails that she was the co-owner of the action and that she would receive $250,000 or more. Mr. Morris also threatened that, if Ms. McGee continued to press him for spousal maintenance, he would keep all funds from her, including any proceeds from the malpractice litigation:

I am going to give you a warning. I gave you a warning a couple of years ago that you did not heed, and look where it got you.

You had better heed this warning.

If you f[--] with me again like you did a couple of years ago, I will make sure you never see another penny from me in ANYTHING in the future. That includes, in particular, the malpractice lawsuit. I will hide that money so f[--] deep that nobody will ever find it, and I will be long gone from America and untouchable by you and any American court.

And you will never get another penny from me for as long as you live.

3

(Expletives modified.)

Thereafter, Mr. Morris took the position that Ms. McGee was not entitled to any part of the settlement proceeds. His counsel communicated to Ms. McGee's counsel that Mr. Morris' "position is that the divorce property settlement agreement does not explicitly reference the malpractice suit and does not make any provision for his ex-wife to share in the recovery." Mr. Morris now contends that the "related lawsuits" (referenced in connection with Ms. McGee's right to share in the proceeds of the "'Cadence' lawsuits and related lawsuits") do not refer to the malpractice litigation, but refer to the so-called RaveSim lawsuit,[2] which is not mentioned anywhere in the Property Settlement Agreement.

In or around January 2013, Ms. McGee filed a garnishment action in the Arizona family court, seeking to recover her share of the malpratice litigation settlement proceeds.[3] The family court awarded Ms. McGee $108,022.89 for unpaid spousal support

---

[2] According to Mr. Morris, RaveSim had agreed to transfer certain intellectual property rights to him but had failed to do so. He says he lost the Cadence lawsuit because RaveSim had not assigned the intellectual property rights to him, and therefore he lacked standing to prosecute his claims. The attorneys' malpractice consisted of their failure to secure the RaveSim rights before suing Cadence. Mr. Morris said that he sued RaveSim to enforce the RaveSim agreement and that the RaveSim lawsuit is the "related" litigation mentioned in the Property Settlement Agreement.

[3] Of the $1,125,000 settlement proceeds from the malpractice litigation, $250,000 went to Mr. Morris' attorneys. If the remaining $875,000 was divided in half, Ms. McGee would be entitled to $437,500. At issue in this appeal is Ms. McGee's half of the net settlement proceeds.

4

from Mr. Morris' share of the settlement proceeds. However, the family court did not adjudicate Ms. McGee's claim that she is entitled to 50% of the malpratice litigation settlement. The family court ordered that Mr. Morris' attorneys freeze the balance of the settlement proceeds in their account.

**B. Bankruptcy proceedings**

While the Arizona family court was considering Ms. McGee's claims to the settlement proceeds,[4] Mr. Morris filed a chapter 11 petition in the Southern District of California.

Mr. Nishi filed a proof of claim for $959,216.12. Mr. Nishi is a friend and business partner of Mr. Morris in one or more of Mr. Morris' businesses. Anne Marie Groden, Mr. Morris' sister, filed an amended proof of claim for $1,153,898.99. Ms. McGee filed a priority claim in the amount of $497,147.19.

On October 24, 2014, the United States Trustee moved to convert Mr. Morris' chapter 11 case to chapter 7. The court granted the motion, stating that:

> Here, Debtor has failed to accurately describe his interest in [a company in which he holds an interest]. He has failed to report numerous prepetition and postpetition transfers involving his various entities and made for his benefit. He has failed to disclose the existence of accounts and assets under his control. He has expended estate assets without disclosing the transactions or obtaining court authority. In

---

[4] Ms. McGee claims that Mr. Morris delayed the family court proceedings for over a year and a half. He filed an interpleader action in the District Court of Nevada, which resulted in a "bad faith, time-consuming, expensive and ultimately unsuccessful attempt at forum shopping." Ultimately, the district court dismissed the interpleader action, holding that Mr. Morris failed to demonstrate that he was domiciled in Nevada and that the claims were not proper claims in an interpleader case. The parties then resumed litigating in the Arizona family court.

particular, he has retained and paid special counsel without court approval. And given Debtor's circumstances, including his Arizona Family Court proceeding, there does not appear to be a reasonable likelihood of rehabilitation.

Debtor has also not fully complied with the court's directive to disclose postpetition income and support. By failing to disclose the many transfers to and from the entities he holds interests in or otherwise controls, Debtor has failed to satisfy applicable reporting requirements. Without good cause, he has failed to attend a scheduled 341(a) meeting of creditors. And he has failed to timely provide the UST with information reasonably requested.

Mr. Morris' amended schedules list the settlement proceeds as an asset of the estate, valued at $441,971.11. His amended schedules also include a $4,138.87 exemption in "Litigation settlement funds - Tiffany & Bosco trust acct" under § 522(d)(5).

**C.    The Motion to Settle**

On May 28, 2015, the Trustee filed a motion to settle Ms. McGee's claims to half of the net malpractice settlement proceeds ("Motion to Settle"). Essentially, the proposed settlement provided that, out of the half of the net proceeds that Ms. McGee claimed, the estate would receive $41,000 and Ms. McGee would receive the remainder. Ms. McGee also agreed to reduce her proof of claim from $497,147.19 to $59,647.19 (a reduction of $437,500) and dismiss with prejudice her § 523(a)(6) claim in her adversary proceeding. The Trustee examined the compromise under Rule 9019 and the four factors of Martin v. Kane (In re A&C Properties), 784 F.2d 1377, 1381 (9th Cir. 1986), and he argued that the settlement was in the best interest of the estate.

Mr. Morris opposed the Motion to Settle by arguing, in summary, that the motion did not satisfy the four factors of

6

A&C Properties and Woodson v. Fireman's Fund Insurance Co. (In re Woodson), 839 F.2d. 610, 620 (9th Cir. 1988), and the settlement was not in the best interests of the estate and creditors. Both Mr. Nishi and Ms. Groden joined in the opposition.

At the hearing on the Motion to Settle, counsel for Mr. Nishi said for the first time that Mr. Nishi was proposing to purchase the litigation against Ms. McGee for $45,000. The oral proposal had only been presented to the Trustee on the morning of the hearing.

Counsel for the Trustee argued that the offer was gamesmanship and would not result in any significant, additional benefit to the estate:

> On the face of it, it just appears to the trustee and myself that this is just a little bit more gamesmanship by the debtor, having Mr. Nishi come in and offer to buy the estate's interest.
>
> . . . .
>
> And that kind of leads to my next point, which is the cost. It's a $4,400 increase. No, a $4,000 increase. And I'm concerned that the cost of analyzing the assignability of it, the cost of renoticing, repapering, and potentially dealing with objection by Mr. Cunningham's firm on behalf of Ms. McGee, all we're really doing is inviting more litigation rather than resolving current litigation. And I'm concerned that those expenses are going to exceed any benefit of $4,000. And the trustee - I'm echoing the trustee's concerns, your honor.
>
> And so rather than resulting in a settlement of the matter, we see it, your honor, as certainly just creating and augmenting more litigation.

The Trustee also argued that Mr. Morris lacked standing to object to the settlement.

At the conclusion of the hearing, the court said:

7

As far as the standing issue goes, I'm highly dubious that the debtor has standing. But observe: the court has considered debtor's counsel's papers and his lengthy argument today, the most lengthy argument of all this day, and credited all of those arguments via the joinder. So they were given a full airing and consideration by the court.

I think under A and C Properties, because that's where the analytical rubber meets the road in this case, that the point has been made very clear that one side desires strongly to perpetuate the litigation in the family law court. The probability of success is uncertain, at best. And that litigation is very complex both within the family law case itself and as it intersects - as those issues intersect with bankruptcy principles.

The settlement works a massive reduction in Ms. McGee's claim . . . .

The court issued its order granting the Motion to Settle (the "Order"). Appellants timely appealed the Order.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334, and 157(b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court abused its discretion in granting the Motion to Settle.

## STANDARD OF REVIEW

We review approval of both a Rule 9019 settlement agreement and a § 363 sale for an abuse of discretion. Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald), 428 B.R. 872, 880 (9th Cir. BAP 2010) (§ 363 sale); Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.), 292 B.R. 415, 420 (9th Cir. BAP 2003) ("Mickey Thompson") (Rule 9019 settlement agreement).

8

To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested," and (2) if it did, we consider whether the bankruptcy court's application of the legal standard was illogical, implausible, or "without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1261–62 & n.21 (9th Cir. 2009) (en banc). "If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion." USAA Fed. Sav. Bank v. Thacker (In re Taylor), 599 F.3d 880, 887–88 (9th Cir. 2010) (citing Hinkson, 585 F.3d at 1261–62).

## DISCUSSION

**A.    Mr. Nishi has standing to appeal the Order.**

As a preliminary matter, we must determine whether either appellant has standing on appeal.  The bankruptcy court determined that while Mr. Morris lacked standing to challenge the Motion to Settle, Mr. Nishi may have standing, and it thus considered the arguments raised by Mr. Morris (and joined in by Mr. Nishi).

To have standing to appeal from a bankruptcy court order, a person must show that he is a "person aggrieved." Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442 (9th Cir. 1983). A person is aggrieved if he is "directly and adversely affected pecuniarily" by the order appealed. Id. As a result, in a

9

typical case, "a hopelessly insolvent debtor does not have standing to appeal orders affecting the size of the estate" as "[s]uch an order would not diminish the debtor's property, increase his burdens, or detrimentally affect his rights." Id.; see also Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 778 n.2 (9th Cir. 1999).

It is well settled, however, that a creditor has "a direct pecuniary interest in a bankruptcy court[']s order transferring assets of the estate." In re P.R.T.C., Inc., 177 F.3d at 778 (citing Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.), 718 F.2d 322, 326 (9th Cir. 1983)); see Redwood Trust v. Am. Bldg. Storage, LLC (In re Am. Bldg. Storage, LLC), 285 F. App'x 375, 376 (9th Cir. 2008) (An equity interest holder had "standing as an aggrieved party because the settlement [guaranteeing creditors $600,000] could 'diminish [its] property . . . [and] detrimentally affect its rights.'" (quoting In re P.R.T.C., Inc., 177 F.3d at 777)).

We need not decide whether Mr. Morris has standing because we agree with the bankruptcy court that Mr. Nishi joined in Mr. Morris' objections, and Mr. Nishi has standing on appeal. It is undisputed that Mr. Nishi currently holds an allowed claim against Mr. Morris' estate under § 502(a); he filed a proof of claim for $959,216.12, to which no one has objected. Any increase or decrease in the estate's share of the malpractice settlement funds would directly affect Mr. Nishi's pecuniary interest. As such, he has standing as a creditor to appeal the court's Order.

/ / /

10

**B.    The court's decision was consistent with § 363.**

Appellants argue that the court committed an error of law by not analyzing the settlement as a sale of estate assets under § 363.  We find no reversible error.

Section 363 provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  § 363(b)(1).  In Mickey Thompson, we held that the proposed compromise at issue was actually a sale of assets requiring analysis under both Rule 9019 and § 363.  In addition to our Rule 9019 analysis, we stated:

> this settlement is in essence a sale of potential claims to the Settling Parties.  While the Agreement purports to act as a mutual release of claims, no party has identified any claims which the Settling Parties could assert against the estate or Trustee.  The record does not contain any evidence that a release of claims by the Settling Parties has value.
>
> Thus, the settlement is in reality a purchase by the Settling Parties of a chose in action of the estate and for which another entity has offered a higher price in circumstances that invite a competitive auction that could yield a considerably higher price.  Settling Parties were free to bid against the third party overbidder.
>
> We agree with the Third Circuit that the disposition by way of "compromise" of a claim that is an asset of the estate is the equivalent of a sale of the intangible property represented by the claim, which transaction simultaneously implicates the "sale" provisions under section 363 as implemented by Rule 6004 and the "compromise" procedure of Rule 9019(a).

In re Mickey Thompson Entm't Grp., Inc., 292 B.R. at 421 (citations omitted).

Appellants argue that the bankruptcy court failed to conduct the § 363 analysis that Mickey Thompson requires.  We disagree.

11

**1. Appellants failed to raise § 363 before the bankruptcy court.**

Appellants did not raise this argument before the bankruptcy court. They merely argued that the settlement was inappropriate under the Woodson and A&C Properties analysis and did not mention § 363.

We decline to consider this issue on appeal, as it was not properly raised before the bankruptcy court in the first instance. As a general rule,

> federal appellate courts will not consider issues not properly raised in the trial courts. O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir. 1989); see also Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.), 252 F.3d 1039, 1045 n.3 (9th Cir. 2001) (stating that appellate court would not explore ramifications of argument because it was not raised in the bankruptcy court); Scovis v. Henrichsen (In re Scovis), 249 F.3d 975, 984 (9th Cir. 2001) (stating that court would not consider issue raised for first time on appeal absent exceptional circumstances). **An issue only is "properly raised" if it is raised sufficiently to permit the trial court to rule upon it.** In re E.R. Fegert, Inc., 887 F.2d at 957.
>
> Notwithstanding this general rule, "[a] reviewing court may consider an issue raised for the first time on appeal if (1) there are exceptional circumstances why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." Franchise Tax Bd. v. Roberts (In re Roberts), 175 B.R. 339, 345 (9th Cir. BAP 1994) (internal quotations omitted) (citing United States v. Carlson, 900 F.2d 1346, 1349 (9th Cir. 1990)).

Ezra v. Seror (In re Ezra), 537 B.R. 924, 932-33 (9th Cir. BAP 2015) (emphasis added).

Appellants failed to raise § 363 in response to the proposed settlement. Further, Appellants have failed to provide us with

12

any exceptional circumstances that would cause us to exercise our discretion to consider this issue for the first time on appeal. As such, we need not consider whether the court erroneously failed to apply § 363 to the Motion to Compromise.

**2. Even if § 363 was properly before the court, the <u>Mickey Thompson</u> analysis is not applicable because Ms. McGee released valuable claims against the estate.**

The § 363 analysis described in <u>Mickey Thompson</u> is not applicable to the proposed compromise. The settlement here was a mutual release between the estate and Ms. McGee, rather than a unilateral compromise contemplated in <u>Mickey Thompson</u>. <u>Cf.</u> <u>Fuchs v. Snyder Tr. Enters. (In re Worldpoint Interactive, Inc.)</u>, 335 F. App'x 669, 670 (9th Cir. 2009) ("We are not persuaded by [appellant's] contention that the settlement amounted to an asset sale under [<u>Mickey Thompson</u>], because both parties to the settlement here released claims." (citing <u>In re Mickey Thompson Entm't Grp., Inc.</u>, 292 B.R. at 421)).

Ms. McGee agreed to reduce her claim by $437,500 and to dismiss a portion of her adversary proceeding. Ms. McGee's claims had significant value because she claimed a right to a specific fund - the malpratice settlement proceeds. In exchange, the estate agreed to forego its claim of entitlement to $400,000 of the malpractice litigation settlement proceeds. Thus, both parties released claims, rendering the settlement a mutual compromise, rather than a sale. Accordingly, the court did not need to analyze the proposed settlement under § 363.

**3. The court had ample basis to reject Mr. Nishi's proposed offer.**

Even assuming that § 363 was raised before the bankruptcy

13

court and was applicable, we hold that the court did not abuse its discretion in rejecting Mr. Nishi's proposed offer.[5]

### a. Mr. Nishi's proposed offer was too late.

The bankruptcy court had ample reason to reject Mr. Nishi's eleventh-hour offer, which was only raised the morning of the hearing. The court has the power to provide for orderly proceedings and had discretion to disregard the late proposal.

### b. There was no documentation of a legitimate offer.

Further, unlike the situation in Mickey Thompson, Mr. Nishi did not make a definite, concrete offer of payment, but only **proposed** to purchase the claims. His counsel called the Trustee's counsel the morning of the hearing to discuss the proposal, but the Trustee remained skeptical. The Trustee's counsel informed the court, "I don't think it's $45,000. I think it was just an offer of $45,000." Mr. Nishi's failure to document his proposal justified its rejection.

### c. There were substantial doubts whether Mr. Nishi's offer was made in good faith.

The Trustee also expressed concern that Mr. Nishi's proposed offer was "just a little bit more gamesmanship by the debtor[.]" In addition to being a creditor of Mr. Morris' estate, Mr. Nishi is also Mr. Morris' friend and business partner. The bankruptcy court had already found that Mr. Morris had engaged in serious

---

[5] The bankruptcy court did not rely on the following points, but "[w]e may affirm the decision of the bankruptcy court on any basis supported by the record." Franklin High Yield Tax-Free Income Fund v. City of Stockton, Cal. (In re City of Stockton, Cal.), 542 B.R. 261, 272 (9th Cir. BAP 2015) (citing ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008)).

14

misbehavior in the bankruptcy case by grossly mismanaging the estate, failing to obey court orders, and withholding information. Faced with the fact that Mr. Nishi was an "insider[ ] - or near insider[ ] -" of a misbehaving debtor, the court did not abuse its discretion by refusing to entertain Mr. Nishi's proposed offer.

### d. Appellants did not take into account Ms. McGee's substantial reduction of her claim.

One purpose of the Mickey Thompson rule is to encourage "overbidding," to maximize creditor recovery. But Mr. Nishi's proposal was probably not an overbid, in the sense that it was not more valuable to the estate than Ms. McGee's settlement. Mr. Nishi's proposal exceeded the cash portion of the settlement ($45,000 versus $41,000 in cash), but Ms. McGee also agreed to reduce her claim by $437,500 in exchange for only about $400,000 of the settlement proceeds paid to Ms. McGee. Mr. Nishi's proposal contained nothing comparable to this claim reduction. In other words, Mr. Nishi's proposed offer was not necessarily a better deal for the estate than the settlement with Ms. McGee.

### e. Any benefit would be offset by extra costs.

The Trustee pointed out that the modest additional $4,000 received by Mr. Nishi's offer would be negated by the additional costs of litigation and administration. Appellants did not contest this assertion. The court had good reason to reject the proposed offer because the additional administrative expenses associated with the new proposal would likely offset any potential gain.

Accordingly, the court did not err under § 363. The record

15

amply supports numerous legitimate reasons for rejecting Mr. Nishi's proposed offer.

**C.   The court properly analyzed the settlement under Rule 9019.**

Appellants argue that the court erred in its application of Rule 9019 to the proposed settlement.  We disagree.

Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Rule 9019(a).  "The bankruptcy court has great latitude in approving compromise agreements." In re Woodson, 839 F.2d at 620 (citing In re A&C Props., 784 F.2d at 1380-81).

> It is clear that there must be more than a mere good faith negotiation of a settlement by the trustee in order for the bankruptcy court to affirm a compromise agreement.  The court must also find that the compromise is fair and equitable. See, e.g., Citibank, N.A. v. Baer, 651 F.2d 1341, 1345-46 (10th Cir. 1980).

> In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re A&C Props., 784 F.2d at 1381 (citation omitted).  The Ninth Circuit has also stated that "[t]he trustee, as the party proposing the compromise, has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." Id. (citing In re Hallet, 33 B.R. 564, 565-66 (Bankr. D. Me. 1983)).

The law favors compromise, "and as long as the bankruptcy

16

court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed.  Thus, on review, we must determine whether the settlement entered into by the trustee was reasonable, given the particular circumstances of the case." Id. (internal citations omitted).

Moreover, "'[w]hen assessing a compromise, courts need not rule upon disputed facts and questions of law, but only canvass the issues.'  If the court were required to do more than canvass the issue, 'there would be no point in compromising; the parties might as well go ahead and try the case.'" Suter v. Goedert, 396 B.R. 535, 548 (D. Nev. 2008) (citations omitted).

**1.   Probability of success in the litigation**

First, the court considered the parties' respective likelihood of success before the Arizona family court.  It held that, "whether Debtor admits it or not, Ms. McGee has more than a colorable claim to the settlement funds[,]" and "the probability of the Trustee's success in the Arizona Family Court is low."

Appellants argue, in summary, that Ms. McGee's probability of success in the Arizona family court litigation is low, because (1) it was improper for Ms. McGee to have brought the action in family court, rather than civil court; (2) the e-mail evidence offered by the Trustee is inadmissible hearsay and settlement communications; and (3) the Property Settlement Agreement did not give Ms. McGee any rights in the malpractice litigation settlement.  We do not find any of these arguments persuasive.

We find no error in the court's assessment that Ms. McGee has asserted at least a "colorable claim" to the settlement

17

proceeds with a substantial probability of success. Even assuming, arguendo, that Ms. McGee asserted her claim in the wrong venue, such a defect does not affect the likelihood of her eventual success in civil court. Likewise, Appellants are wrong regarding the admissibility of the e-mail evidence. The e-mails, which clearly evidence Mr. Morris' intent and expectation that Ms. McGee recover half of the net malpractice litigation settlement proceeds, are admissions of a party-opponent that are not hearsay under Federal Rule of Evidence 801(d)(2). Additionally, they were not confidential settlement communications under Federal Rule of Evidence 408. As such, the e-mails support the conclusion that Ms. McGee would likely be successful in prosecuting her claims.

Further, Appellants' interpretation of the Property Settlement Agreement is implausible at best. Appellants argue that the reference to "related" litigation points to the RaveSim lawsuit, and not to the malpractice suit. But a plain reading of the Property Settlement Agreement suggests that an action for legal malpractice committed in the Cadence lawsuit is "related" to that lawsuit. Further, the Property Settlement Agreement says that Mr. Morris and Ms. McGee would split "the 'Cadence' lawsuits and related lawsuits (See paragraph 29)." The only lawsuit mentioned in paragraph 29 (apart from the Cadence lawsuit itself) is the potential malpractice lawsuit. In contrast, the Property Settlement Agreement does not even mention the RaveSim lawsuit. Accordingly, we hold that the court did not err in holding that the Trustee's probability of success is low.

/ / /

18

## 2.  Difficulties in collection

Second, the court noted that an appeal by either side would delay collection efforts.  On appeal, Appellants argue that "there is no danger in collecting once the issues are finally adjudicated[,]" while Appellees argue that "this factor is neutral[,]" because "[a]ppeals delaying collection are likely."

Neither party has raised any difficulty in collecting, because the Arizona family court froze the funds in Mr. Morris' attorneys' client account.  As such, this factor is neutral.

## 3.  Complexity of the litigation involved and the attendant expense, inconvenience, and delay

Third, the court accurately observed that "Debtor's assertion that the Arizona Court has no jurisdiction to adjudicate the matter actually hurts his cause - if that court lacks jurisdiction, then Ms. McGee will bring her action in another court, thus compounding the litigation's complexity, expense, inconvenience, and delay."  It held that "the issues the Trustee faces in that court are decidedly complex, and very likely to cause significant expense, inconvenience, and delay."

Appellants do not offer any cogent argument contesting the court's ruling.  The record amply demonstrates that Mr. Morris would likely do anything in his power to delay and frustrate Ms. McGee's efforts to enforce the Property Settlement Agreement, as he threatened in his e-mails to Ms. McGee.  We find no error in the court's assessment of the underlying litigation.

## 4.  Interests of the creditors

Fourth, the court held that "the Trustee's proposed settlement benefits the estate's creditors."  It stated that,

"given this court's findings that led to conversion of this case, Debtor's ability to argue on behalf of creditors of this estate is dubious. Indeed, that the Trustee proposes to use these settlement funds to investigate Debtor and his insiders only highlights the essentially self-serving nature of Debtor's arguments . . . ."

The court ultimately held that "[t]he Trustee negotiated his settlement with Ms. McGee in good faith. And the settlement is both fair and equitable." The court did not abuse its discretion. Appellants only argue that the court did not explain its ruling and that Mr. Nishi and Ms. Groden (who both asserted claims against the estate) opposed the settlement. Especially given Mr. Nishi's and Ms. Groden's connections to Mr. Morris, the court did not err in declining to give deference to their views and holding that the proposed settlement was in the best interests of the creditors.

**D.      The Trustee presented the court with a sufficient record.**

Appellants argue that the court could not have properly evaluated the A&C Properties factors, because the Trustee presented the court with a deficient evidentiary record concerning the family court litigation and the malpractice litigation settlement. In essence, Appellants argue that (1) the Trustee failed to offer the declaration of Mr. Morris' Arizona attorney, Kelly Mendoza, regarding his likelihood of success or his positions in the underlying suit; (2) the Trustee failed to present Mr. Morris' positions in the underlying dispute; and (3) the Trustee made factual misstatements before the court. We reject these arguments.

20

First, there is no requirement that the Trustee present the declaration of Mr. Morris' counsel. Appellants offer no authority in support of such a requirement. Under A&C Properties and its progeny, the bankruptcy court must canvass the issues, see Suter, 396 B.R. at 548 (citation omitted), but there is no requirement that the court must always solicit the views of both parties or their counsel. We agree with Appellees that, based on the documents in the record, the Trustee and the court did not need Ms. Mendoza's declaration to understand Mr. Morris' position.

Second, the record was sufficient for the court to understand Mr. Morris' position and his assessment of the state court litigation. For example, the court was aware of Mr. Morris' position when it ruled on Ms. McGee's motion for relief from stay and Mr. Morris' motion to dismiss Ms. McGee's adversary complaint, both of which informed the court of the key issues considered in the Motion to Settle. As such, we reject Appellants' false contention that the court could not "make an informed decision because the Court has no idea what it is to make a decision about."

Appellants appear to fault the Trustee for essentially failing to argue Mr. Morris' position that he is likely to prevail in the Arizona family court litigation. It was not the Trustee's responsibility to do so. The Trustee, having considered both Mr. Morris' position and Ms. McGee's position, exercised his business judgment in determining that settling with Ms. McGee was in the best interest of the estate. He had no duty to advocate for Mr. Morris; rather, it was Mr. Morris' counsel's

21

job to convince the court of his client's position.

Appellants also argue that the Trustee could not have presented the court with a complete record, because he did not discuss the settlement with Mr. Morris, either through counsel or at his § 341 meeting. They conclude that, "because the Trustee did not avail himself of the opportunity to informally discuss the matter with the Debtor[,] the Trustee was unable to present the Bankruptcy Court with a record regarding the Debtor's positions . . . ." However, the germane question is not what the Trustee did or knew, but whether the court had a sufficient basis for its ruling. As we noted above, the court had more than an ample understanding of the issues.

Finally, regarding the alleged misstatements,[6] we need not make those factual determinations here. Even if Appellants were correct, there is no indication that the court based its Order on them.

Accordingly, we discern no reversible error concerning the record before the court.

**E.    The Panel denies the parties' motions to supplement.**

Both Appellants and Appellees filed motions to supplement

---

[6] Appellants argue that the Trustee made factual misstatements that (1) Ms. McGee and "the community" were parties to the malpractice lawsuit; and (2) that Mr. Morris' Arizona attorneys were paid $6,000 and retained without court approval. As to the first point, Appellants fail to explain how this statement affects the Motion to Settle. As to the second point, Appellants concede that both statements are true, but contend that they are misleading, because Ms. Groden paid the legal fees (not the estate), and Mr. Morris sought court approval to retain counsel, but the application was denied. Again, Appellants fail to explain how these minor differences might have affected the court's decision.

the record. Appellants request leave to augment the record by adding four additional documents filed in the bankruptcy court **after** they filed their notice of appeal. Similarly, Appellees offer two documents filed in the Arizona family court **after** Appellants filed their notice of appeal.

We decline to take judicial notice of the documents. Our job is to determine whether the bankruptcy court erred based on the evidence before it, which in turn depends in part on the then-existing circumstances surrounding the Motion to Settle. The bankruptcy court did not have any of the proffered documents before it, and therefore they are irrelevant to this appeal.

Additionally, Appellants claim that their documents are "relevant to the issue of whether the appeal is moot." The issue of mootness was not briefed by the parties or otherwise raised on appeal. No one claims that this appeal is moot, and, if anything, the new documents confirm that this appeal is not moot. We thus need not consider the new documents.

## CONCLUSION

For the reasons set forth above, we conclude that the bankruptcy court did not abuse its discretion in granting the Motion to Settle as fair and equitable. Accordingly, we AFFIRM.